UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X
                                                                 :
**JOHN DOES 1-2, JANE DOES 1-3, JACK**                           :
**DOES 1-750, and JOAN DOES 1-750,**                             :
                                                                 :
                                    Plaintiffs,                  :     **MEMORANDUM DECISION AND**
                                                                 :     **ORDER**
                                                                 :
                   – against –                                   :     21-CV-5067 (AMD) (TAM)
                                                                 :
**KATHY HOCHUL,** *in her official capacity as*                  :
*Governor of the State of New York, et al.*,                     :
                                                                 :
                                    Defendants.                  :
---------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

On September 10, 2021, the plaintiffs filed this action against the defendants, together
with an application for a temporary restraining order ("TRO") and a preliminary injunction,
challenging the lawfulness of a New York State regulation that required most healthcare workers
to be "fully vaccinated against COVID-19." (ECF No. 1.) *See* N.Y. Comp. Codes R. & Regs.,
tit. 10, § 2.61 ("Section 2.61"). Before the Court are the defendants' motions to dismiss. (ECF
Nos. 81, 82, 83, 84, 87.) For the reasons that follow, the defendants' motions are granted.

## BACKGROUND[1]

---

[1] The factual recitation is based on the complaint, as well as official public records on which the plaintiffs
rely and which are subject to judicial notice under Rule 201 of the Federal Rules of Evidence, including
the Emergency Order, the challenged Rule—Section 2.61—and the legislative history. In addition, I
take judicial notice of reports and other information from the Centers for Disease Control and
Prevention, and other reliable public health authorities. When considering a motion made pursuant to
Rule 12(b)(6), the Court may take judicial notice of "documents retrieved from official government
websites," *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y.
2015), or other "relevant matters of public record," *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir.
2012); *see also Lowe v. Mills*, No. 21-CV-242, 2022 WL 3542187, at *2 (D. Me. Aug. 18, 2022) (taking
judicial notice of the rule challenged, the related statute and its legislative history, as well as
"information from the official U.S. Centers for Disease Control and Prevention ('CDC') and the Maine
CDC government websites "that is not subject to reasonable dispute" (internal quotation marks and
citation omitted)); Fed. R. Evid. 201(b) (permitting judicial notice of facts "not subject to reasonable
dispute").

The plaintiffs are five individuals identified as John and Jane Does. (ECF No. 1 ¶¶ 10-14.) [2] They bring this lawsuit against Governor Kathy Hochul and Commissioner Howard Zucker of the New York State Department of Health, in their official capacities (collectively, the "State Defendants"), as well as three nonprofit corporations that operate healthcare facilities in New York—New York-Presbyterian Healthcare System, Inc. ("NYP"), Trinity Health, Inc. ("Trinity") and Westchester Medical Center Advanced Physician Services ("WMC") (together, the "Private Defendants"). John Doe 2 and Jane Doe 1 were employed by NYP, Jane Doe 2 was employed by WMC and Jane Doe 3 was employed by Trinity. [3] (*Id.* ¶¶ 11-14.) John Doe 1 was the board president of an unnamed private, faith-based senior care facility. [4] (*Id.* ¶ 10.) As explained more fully below, the State issued Section 2.61 to address the spread of COVID-19 in healthcare facilities and nursing homes, because of the risks to patients, the elderly and front-line healthcare workers. The plaintiffs object to taking the vaccine on religious grounds and argue that requiring them to comply with Section 2.61 violates their rights.

It is the consensus of reliable public health authorities that the COVID-19 vaccine prevents the spread of the virus, and that healthcare professionals who work directly with

Moreover, the Court may take judicial notice of facts regarding COVID-19. *L.T. v. Zucker*, No. 21-CV-1034, 2021 WL 4775215, at *1 n.3 (N.D.N.Y. Oct. 13, 2021) ("The Court takes judicial notice of facts regarding the spread and lethality of COVID-19 as reported by dependable public health authorities."); *see also Hopkins Hawley LLC v. Cuomo*, No. 20-CV-10932, 2021 WL 1894277, at *2 n.2 (S.D.N.Y. May 11, 2021) ("Under Rule 201 of the Federal Rules of Evidence, the Court may take judicial notice of facts that are 'generally known within the trial court's territorial jurisdiction.' FED. R. EVID. 201. General facts regarding the COVID pandemic indisputably fall within Rule 201's purview.").

[2] The complaint also named six groups of plaintiffs, each numbering 250, referred to collectively as Jack and Joan Does. (ECF No. 1 ¶¶ 15-20.) However, the plaintiffs have since explained that these groups of plaintiffs were "simply placeholder names," and are "not present in the suit." (Aug. 2, 2022 Tr. at 22:7-22.)

[3] Trinity argues that it was not Jane Doe 3's employer. (ECF No. 83-1 at 5-7.) I do not address the merits of this argument.

[4] All of the plaintiffs have since been fired from their jobs. (Aug. 2, 2022 Tr. at 7:10-15.)

vulnerable patients should be vaccinated.  According to the CDC, "mRNA COVID-19 vaccines are highly effective in preventing SARS-CoV-2 infections in real-world conditions among health care personnel, first responders, and other essential workers.  These groups are more likely than the general population to be exposed to the virus because of their occupations."[5]  The CDC further advised that, "SARS-CoV-2 transmission between unvaccinated persons is the primary cause of continued spread."[6]

Healthcare societies and organizations have called for "all health care and long-term care employers to require their employees to be vaccinated against COVID-19."[7]  In a July 26, 2021 press release, the American Medical Association stated, "It is critical that all people in the health care workforce get vaccinated against COVID-19 for the safety of our patients and our colleagues . . . . Increased vaccinations among health care personnel will not only reduce the spread of COVID-19 but also reduce the harmful toll this virus is taking within the health care workforce and those we are striving to serve."[8]  The American Association of Critical-Care Nurses called for "all healthcare and long-term care employers to require every member of the healthcare team—employees and all credentialed and contracted providers—to be vaccinated against COVID-19 . . . we believe mandated vaccination is the best path to support the physical safety of patients, nurses, their colleagues, and their families and a means to prevent further

---

[5] Centers for Disease Control and Prevention, CDC Real-World Study Confirms Protective Benefits of mRNA COVID-19 Vaccines (Mar. 29, 2021), https://www.cdc.gov/media/releases/2021/p0329-COVID-19-Vaccines.html.

[6] Centers for Disease Control and Prevention, Science Brief: COVID-19 Vaccines and Vaccination (Mar. 8, 2021), https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/fully-vaccinated-people.html.

[7] American Medical Association, AMA in support of COVID-19 vaccine mandates for health care workers (Jul. 26, 2021), https://www.ama-assn.org/press-center/press-releases/ama-support-covid-19-vaccine-mandates-health-care-workers.

[8] *Id.*

trauma and moral injury imposed by the pandemic on our health care workforce."[9]  And on July

31, 2021, the American College of Occupational and Environmental Medicine recommended

that the "COVID-19 vaccination be mandated for all health care workers (HCWs) . . . . With the

recent surge of SARS-CoV-2 infections in the United States (U.S.) due to the Delta variant, it is

even more imperative that HCWs be vaccinated. Unvaccinated HCWs put themselves in danger

of contracting the disease and pose a risk to potentially transmit the virus to patients (especially

their vulnerable patients), colleagues, and families."[10]

In August 2021, the COVID-19 pandemic was still surging in New York, with daily

positive cases up over 1000% over the course of six weeks.  (ECF No. 1-7 at 2.)  In light of the

continuing COVID-19 pandemic, then-Governor Andrew Cuomo announced on August 16,

2021, that "all healthcare workers in New York State" would be required to be vaccinated

against COVID-19 by September 27, 2021.  (*Id.*)  On August 18, 2021, Commissioner Zucker

issued a short-term "Order for Summary Action" (the "Emergency Order") under New York

Public Health Law § 16, because of "increased challenges and urgency for controlling the spread

of [COVID-19]" in healthcare facilities due to vulnerable patient and resident populations, and

the "unacceptably high risk" caused by unvaccinated personnel, in both "acquiring COVID-19

and transmitting such virus to colleagues and/or vulnerable patients or residents."  (ECF No. 1-8

at 2-3.)[11]  Under the Emergency Order, "general hospitals and nursing homes" were required to

---

[9] American Association of Critical-Care Nurses, AACN Statement on COVID-19 Vaccination, https://www.aacn.org/newsroom/aacn-statement-on-covid-19-vaccination (last visited Sept. 30, 2022).

[10] American College of Occupational and Environmental Medicine, ACOEM Supports COVID-19 Vaccine Mandates for Health Care Workers (July 31, 2022), https://acoem.org/Guidance-and-Position-Statements/Guidance-and-Position-Statements/ACOEM-Supports-COVID-19-Vaccine-Mandates-for-Health-Care-Workers.

[11] Section 16 authorizes the Commissioner to issue an order—effective for a maximum of 15 days—in response to a condition that in his opinion constitutes a "danger to the health of the people."  N.Y. Pub. Health Law § 16.

ensure that their personnel were fully vaccinated against COVID-19, with limited exceptions for religious objections or medical contraindications. (*Id.* at 3.) The Emergency Order defined personnel as "All persons employed or affiliated with a covered entity, whether paid or unpaid, including but not limited to employees, members of the medical and nursing staff, contract staff, students, and volunteers, who engage in activities such that if they were infected with COVID-19, they could potentially expose, patients, residents, or personnel working for such entity to the disease." (*Id.* at 3-4.) The Emergency Order included a medical exemption, in the form of a "reasonable accommodation," for those employees for whom vaccination would be "detrimental," based on "a specific pre-existing health condition," as certified by a licensed physician or certified nurse practitioner. (*Id.* at 5.) In addition, the Emergency Order provided a religious exemption for employees with "a genuine and sincere religious belief contrary to the practice of immunization, subject to a reasonable accommodation by the employer." (*Id.* at 5-6.) The Emergency Order required Covered Personnel to be "fully vaccinated," and to have received the first dose by September 27, 2021. (*Id.* at 5.)

Three of the plaintiffs received religious exemptions: NYP granted Jane Doe 1's request, Trinity granted Jane Doe 3's request and NYP granted John Doe 2's request.[12] (ECF No. 1 ¶¶ 11-14, 81-93.)

On the same day that the Emergency Order was issued, the New York State Department of Health released the results of a first-in-the-nation vaccine effectiveness study, published by the CDC, finding that "unvaccinated New Yorkers were eleven times more likely to be hospitalized and eight times more likely to be diagnosed with COVID-19 than those who were

---

[12] John Doe 1 did not work for any of the Private Defendants, and Jane Doe 2 did not request a religious exemption before Section 2.61 was approved. (ECF No. 1 ¶¶ 13, 88-89.)

fully vaccinated."[13]  In the press release announcing the study, Commissioner Zucker said, "The findings of our research are clear: Vaccines provide the strongest protection for New Yorkers against getting infected or becoming hospitalized due to COVID-19." (*Id.*)  Moreover, the Commissioner noted the increase in COVID-19 cases and hospitalization in New York as a result of the Delta variant: "New Yorkers still need to remain vigilant as the Delta variant has led to increases in COVID-19 cases and hospitalizations." (*Id.*)  Thereafter, on August 23, 2021, the Food and Drug Administration approved the Pfizer vaccine for adults 16 years old and older; the vaccination had previously been authorized only under "emergency use authorization (EUA)."[14] The FDA stated, "[T]he public can be very confident that this vaccine meets the high standards for safety, effectiveness, and manufacturing quality the FDA requires of an approved product." (*Id.*)  On August 24, 2021, Governor Andrew Cuomo resigned, and Governor Hochul assumed office.[15]

On August 26, 2021, New York's Department of Health adopted emergency regulation 10 N.Y.C.R.R. § 2.61; the State's Public Health and Health Planning Council (the "PHHPC"), charged with issuing regulations "affecting the security of life or health or the preservation and improvement of public health" including those addressing the control of communicable diseases, N.Y. Pub. Health L. § 225(4), (5), issued Section 2.61.  The PHHPC issued the following the Regulatory Impact Statement: "Since early July, [COVID-19] cases have risen 10-fold, and 95

---

[13] New York State Department of Health, New York State Department of Health Releases First-In-The-Nation Data and Analysis On Covid-19 Vaccine Effectiveness and Breakthrough Infections (Aug. 18, 2021), https://health.ny.gov/press/releases/2021/2021-08-18_mmwr_vaccine_study.htm.

[14] U.S. Food and Drug Administration, FDA Approves First COVID-19 Vaccine (Aug. 23, 2021), https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine.

[15] New York State Governor's Office, Video, Audio, Photos & Rush Transcript: Kathy Hochul Is Sworn in as 57th Governor of New York State (Aug. 24, 2021), https://www.governor.ny.gov/news/video-audio-photos-rush-transcript-kathy-hochul-sworn-57th-governor-new-york-state.

percent of the sequenced recent positives in New York State were the Delta variant. Recent New York State data show that unvaccinated individuals are approximately 5 times as likely to be diagnosed with COVID-19 compared to vaccinated individuals. Those who are unvaccinated have over 11 times the risk of being hospitalized with COVID-19. The COVID-19 vaccines are safe and effective. They offer the benefit of helping to reduce the number of COVID-19 infections, including the Delta variant, which is a critical component to protecting public health. Certain settings, such as healthcare facilities and congregate care settings, pose increased challenges and urgency for controlling the spread of this disease because of the vulnerable patient and resident populations that they serve. Unvaccinated personnel in such settings have an unacceptably high risk of both acquiring COVID-19 and transmitting the virus to colleagues and/or vulnerable patients or residents, exacerbating staffing shortages, and causing unacceptably high risk of complications." (ECF No. 1-9 at 10.)

The PHHPC also considered alternative approaches—testing protocols and face coverings—both of which it deemed to be less effective than vaccinations. "One alternative would be to require covered entities to test all personnel in their facility before each shift worked." (ECF No. 1-9 at 13.) The PHHPC concluded that testing was "limiting" because it would show a person's status only at the time of the test, would not be completely reliable for some asymptomatic individuals, and because testing every person every day would be impractical, and a "financial burden" on healthcare facilities. (*Id.* at 13-14.) The PHHPC observed that masking alone was "helpful to reduce transmission," but "did not prevent transmission," and that "masking in addition to vaccination will help reduce the numbers of infections in these settings even further." (*Id.*)

Section 2.61 required that covered entities "continuously require personnel to be fully vaccinated against COVID-19, with the first dose for current personnel received by September 27, 2021 for general hospitals and nursing homes, and by October 7, 2021 for all other covered entities." 10 N.Y.C.R.R. § 2.61; (ECF No. 1-9 at 3.) Section 2.61 defines "personnel" as the Emergency Order did. The Emergency Order covered only "general hospital[s] or nursing[s] home pursuant to section 2801 of the Public Health Law," while Section 2.61 covered additional healthcare entities.[16] The medical exemption in Section 2.61 provided that if "any licensed physician or certified nurse practitioner certifies that immunization with COVID-19 vaccine is detrimental to the health of member of a covered entity's personnel, based upon a pre-existing health condition, the requirements of this section relating to COVID-19 immunization shall be inapplicable only until such immunization is found no longer to be detrimental to such personnel member's health." 10 N.Y.C.R.R. § 2.61; (ECF No. 1-9 at 5.) Unlike the Emergency Order, Rule 2.61 did not include a religious exemption.

Following the promulgation of the Section 2.61, the Private Defendants amended their vaccination policies to comply with state requirements. (ECF No. 1 ¶¶ 11-14, 81-93; *see also* ECF Nos. 83-1 at 3-4, 85 at 5-6, 87-3 at 5.) On September 8, 2021, NYP revoked John Doe 2's religious exemption, and advised him that "religious exemptions are no longer accepted." (ECF No. 1 ¶¶ 82-83; ECF No. 1-11.) On August 30, 2021, NYP emailed Jane Doe 1 a general update about the terms of its COVID-19 vaccination program (ECF No. 1-13), including an "important

---

[16] "Covered entities" include: "(i) any facility or institution included in the definition of "hospital" in section 2801 of the Public Health Law, including but not limited to general hospitals, nursing homes, and diagnostic and treatment centers; (ii) any agency established pursuant to Article 36 of the Public Health Law, including but not limited to certified home health agencies, long term home health care programs, acquired immune deficiency syndrome (AIDS) home care programs, licensed home care service agencies, and limited licensed home care service agencies; (iii) hospices as defined in section 4002 of the Public Health Law; and (iv) adult care facility under the Department's regulatory authority, as set forth in Article 7 of the Social Services Law." 10 N.Y.C.R.R. § 2.61(a)(1).

update on the exemption process:" "the Council made the determination to exclude religious exemptions as an alternative to receiving the vaccine. The DOH cited examples of measles and other vaccinations, which are required of NY healthcare workers, as also not having a religious exemption. As a healthcare institution in NYS, NYP must follow the NYS DOH requirements as they evolve. This means that NYP can no longer consider any religious exemptions to the COVID vaccination [] even those previously approved." (*Id.*) Accordingly, NYP revoked Jane Doe 1's previously granted religious exemption. On August 26, 2021, Jane Doe 2 requested a religious exemption. (ECF No. 1 ¶¶ 88-89; ECF No. 1-14.) On August 27, 2021, WMC denied that request in an email advising her that "[o]n August 26, hospitals were notified that the New York State Department of Health was removing the option allowing hospitals to offer a religious exemption to health care workers from receiving the COVID-19 vaccination. Accordingly, WMCHealth, in order to comply with DOH Regulations, will no longer accept applications for a religious exemption and those applications already received will [] not be considered." (ECF No. 1-14.) On September 1, 2021, Trinity revoked Jane Doe 3's religious exemption. (ECF No. 1 ¶¶ 90-93; ECF No. 1-16.)

On September 1, 2021, the plaintiffs' counsel sent a "legal demand" to the State Defendants and the New York Attorney General, asking that they rescind the COVID-19 vaccine requirement by September 7, 2021, and announce that "New York will no longer purport to nullify or override the right of New York citizens to seek religious exemptions from vaccination requirements under federal and state law." (ECF No. 1 ¶¶ 114-17; *see also* ECF No. 1-17.) When they received no reply, the plaintiffs filed this lawsuit on September 10, 2021, against all of the defendants for violations of the Supremacy Clause and federal conspiracy law, against the State Defendants for violations of the Free Exercise Clause and the Equal Protection Clause, and

against the Private Defendants for violations of Title VII of the Civil Rights Act. (ECF No. 1 ¶¶ 119-90.) The plaintiffs concede that they did not obtain a "Right to Sue" letter from the Equal Employment Opportunity Commission ("EEOC") before filing the lawsuit. (ECF No. 94 at 31-33.)[17]

The plaintiffs allege that they have sincerely held religious beliefs[18] that "all life is sacred, from the moment of conception to natural death, and that abortion is a grave sin against God and the murder of an innocent life."[19] (ECF No. 1 ¶ 43.) The plaintiffs claim the "COVID-19 vaccines [were] developed and produced from, tested with, researched on, or otherwise connected with the aborted fetal cell lines HEK-293 and PER.C6." (ECF No. 1 ¶ 60.) According to the plaintiffs, their religious beliefs "preclude them from accepting or receiving any of the three available COVID-19 vaccines because of the connection between the various COVID-19 vaccines and the cell lines of aborted fetuses." (*Id.* ¶ 42.) They claim that the absence of a religious exemption forces them "to choose between maintaining the ability to feed their families and the free exercise of their sincerely held religious beliefs." (*Id.* ¶ 112.) The plaintiffs seek a blanket exemption from the requirement; they do not seek accommodations, such as assignments that would not include direct contact with vulnerable patients and residents.[20] The plaintiffs state: "**All Plaintiffs seek in this lawsuit is to be able to continue to provide the healthcare they have provided to patients for their entire careers, and to do so**

---

[17] The record does not include any information about when the plaintiffs filed a complaint with the EEOC, or against which Private Defendants they filed complaints.

[18] The defendants do not challenge the sincerity of the plaintiffs' religious beliefs.

[19] John Doe 2 states that he is affiliated with the Church of Christ, Scientist. (ECF No. 1 ¶ 67.)

[20] The plaintiffs say that the "accommodation" they would have accepted was to "wear facial coverings, submit to reasonable testing and reporting requirements, monitor symptoms, and otherwise comply with [the] reasonable conditions" with which they had previously complied. (ECF No. 1 ¶¶ 71, 75.) As discussed further below, that is not an "accommodation." It is a blanket exception from Section 2.61.

**under the same protective measures that have sufficed for them to be considered superheroes for the last 18 months.**"  (ECF No. 1 ¶ 8 (emphasis in the original).)

The defendants moved to dismiss on February 17, 2022.  (ECF Nos. 81, 82, 83, 84, 87.)  All of the defendants argue that the complaint should be dismissed in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted; Trinity also argues for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(3) for improper venue.

## I.    The Plaintiffs' Temporary Restraining Order and Preliminary Injunction Application

The same day that the plaintiffs filed this action, they moved for a Temporary Restraining Order and a preliminary injunction to bar the defendants from enforcing Section 2.61.  (ECF No. 1 at 43-45; ECF No. 2.)  On September 12, 2022, the Honorable William Kuntz of this Court denied a similar request in *We The Patriots USA, Inc. et al v. Hochul et al.*, No. 21-CV-4954 (E.D.N.Y. Sept. 12, 2021).  Two days later, on September 14, 2021, in *Dr. A v. Hochul*, the Honorable David Hurd in the Northern District of New York granted an application for a TRO, filed by seventeen healthcare workers employed in New York State, that enjoined the State from enforcing Section 2.61.  *Dr. A v. Hochul*, No. 21-CV-1009, 2021 WL 4189533 (N.D.N.Y. Sept. 14, 2021).  Also on September 14, 2021, the Honorable Eric Komitee of this Court found that the plaintiffs' application for a TRO in this case was moot in view of Judge Hurd's order.  (ECF No. 35.)  On October 12, 2021, Judge Hurd granted the plaintiffs' application for a preliminary injunction in *Dr. A v. Hochul,* enjoining enforcement of Section 2.61.  *See Dr. A. v. Hochul*, No. 21-CV-1009, 2021 WL 4734404 (N.D.N.Y. Oct. 12, 2021).  The orders in *We The Patriots* and *Dr. A.* were appealed to the Second Circuit.  On October 18, 2021, this Court held the plaintiffs' application for a preliminary injunction in abeyance pending the Second Circuit's decision.

On October 29, 2021, the Second Circuit affirmed Judge Kuntz's denial of the TRO, reversed Judge Hurd's order and vacated the preliminary injunction. The court issued an opinion explaining the basis for its decision on November 4, 2021. *See We The Patriots USA, Inc. v. Hochul* (*We The Patriots I*), 17 F.4th 266 (2d Cir. 2021) (per curiam), concluding that the plaintiffs did not establish a likelihood of success on the merits of their claims. *Id.* at 294. In its review of Section 2.61, the court applied the rational basis standard, and found that the plaintiffs failed to demonstrate that Section 2.61 was not neutral or generally applicable. In the court's view, Section 2.61 was "a reasonable exercise of the State's power to exact rules to protect public health." *Id.* at 290. Moreover, the court found that the plaintiffs were unlikely to succeed on their claim that Section 2.61 is preempted by Title VII because Title VII "does not require covered entities to provide the accommodation that Plaintiffs prefer—in this case, a blanket religious exemption allowing them to continue working at their current positions unvaccinated," and because "Section 2.61's text does not foreclose all opportunity for Plaintiffs to secure a reasonable accommodation under Title VII." *Id.* at 292-93.

In a subsequent, clarifying opinion, the Second Circuit explained that its opinion should not be interpreted to hold that employers could "grant religious accommodations that allow employees to continue working, unvaccinated, at positions in which they 'engage in activities such that if they were infected with COVID-19, they could potentially expose other covered personnel, patients or residents to the disease,'" *We The Patriots USA, Inc. v. Hochul* (*We The Patriots II*), 17 F.4th 368, 370 (2d Cir. 2021). Rather, the court explained, "Section 2.61, on its

face, does not bar an employer from providing an employee with a reasonable accommodation *that removes the individual from the scope of the Rule*." *Id.* (emphasis in original).[21]

On November 12, 2021, the *Dr A.* plaintiffs filed an emergency application for injunctive relief with the Supreme Court, which denied the application on December 13, 2021.  *See Dr. A v. Hochul*, 142 S. Ct. 552 (2021).  Separately, on June 30, 2022, the Supreme Court denied the *Dr. A* plaintiffs' petition for a writ of certiorari to review the Second Circuit's decision in *We The Patriots I*.  *Dr. A. v. Hochul*, 142 S. Ct. 2569 (2022).  On August 2, 2022, I denied the plaintiffs' motion for a preliminary injunction as moot, in view of the Second Circuit's decision.  (August 2, 2022 Order.)  The plaintiffs disagreed that the motion was moot but conceded that it was "likely inevitabl[e] [] to be denied under the findings of the Second Circuit."  (Aug. 2, 2022 Tr. at 6:5-8.)

## LEGAL STANDARD

To avoid dismissal, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Although "detailed factual allegations" are not required, a complaint that includes only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."

---

[21] The Second Circuit emphasized that it was not deciding "the ultimate merits of Plaintiffs' legal claims or of the State's defenses," but was making a "limited determination with respect to preliminary relief based on the limited factual record" before it. *We The Patriots I*, 17 F.4th at 273-74.  The court reiterated the point in its clarifying opinion: "We caution further that our opinion addressed only the likelihood of success on the merits of Plaintiffs' claims; it did not provide our court's definitive determination of the merits of those claims." *We The Patriots II*, 17 F.4th at 371.  Mindful of that distinction, I cite those portions of the opinions in which the court refers to similar record evidence, applies precedent to similar facts or refers to binding precedent in this Circuit.

*Twombly*, 550 U.S. at 555. A complaint fails to state a claim "if it tenders naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (internal quotation marks, alterations and citations omitted).

## DISCUSSION

I.     **Free Exercise Claim**

In 1905, the Supreme Court upheld the constitutionality of a vaccine mandate in the midst of a smallpox outbreak. Writing for the majority in rejecting the appellant's Fourteenth Amendment challenge, Justice John Harlan observed that "the liberty secured by the Constitution . . . does not import an absolute right in each person to be . . . wholly freed from restraint. There are manifold restraints to which every person is necessarily subject for the common good. On any other basis organized society could not exist with safety to its members. Society based on a rule that each one is a law unto himself would soon be confronted with disorder and anarchy. Real liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to use his own, whether in respect of his person or his property, regardless of the injury that may be done to others." *Jacobson v. Massachusetts*, 197 U.S. 11, 26 (1905). The Court was "not prepared to hold that a minority, residing in any city or town where smallpox is prevalent, and enjoying the general protection afforded by an organized local government, may thus defy the will of its constituted authorities, acting in good faith for all, under the legislative sanction of the state. If such be the privilege of a minority, then like privilege would belong to each individual of the community, and the spectacle would be presented of the welfare and safety of an entire population being subordinated to the notions of a single individual who chooses to remain a part of that population." *Id*. at 37-38.

In the years since *Jacobson* was decided, the Supreme Court has reaffirmed the principle that governments have the power to enact mandatory vaccination policies to protect the public

health in the face of a public health emergency.  *See, e.g., Zucht v. King*, 260 U.S. 174, 176 (1922) ("It is within the police power of a state to provide for compulsory vaccination."); *Prince v. Massachusetts*, 321 U.S. 158, 166-67 (1944) ("The right to practice religion freely does not include liberty to expose the community of the child to communicable disease or the latter to ill health or death.").  This Circuit has also recognized that mandatory vaccination policies are not unconstitutional.  *See, e.g.*, *Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015) ("[M]andatory vaccination as a condition for admission to school does not violate the Free Exercise Clause").  Other district courts have held the same.  *See, e.g.*, *Klaassen v. Trs. of Ind. Univ.*, 7 F.4th 592, 593 (7th Cir. 2021) ("Given *Jacobson v. Massachusetts*, which holds that a state may require all members of the public to be vaccinated against smallpox, there can't be a constitutional problem with vaccination against SARS-CoV-2."); *Williams v. Brown*, 567 F. Supp. 3d 1213, 1226 (D. Or. 2021) ("The Court joins this growing consensus and concludes that there is no fundamental right under the Constitution to refuse vaccination and that rational basis review applies to Plaintiffs' due process challenge."); *Does 1-6 v. Mills*, 566 F. Supp. 3d 34, 45 n.12 (D. Me. 2021), *aff'd*, 16 F.4th 20 (1st Cir. 2021) ("*Jacobson* has been treated as informative authority both regarding the scope of government power to enact mandatory vaccination requirements to protect public health and for the proposition that the Constitution does not require religious exemptions from state-mandated vaccinations.").

The plaintiffs do not dispute that the COVID-19 pandemic has created a serious health emergency in New York.  Nor do they appear to deny that exposure to the virus is especially dangerous to hospital patients and nursing home residents or claim that the State could not enact legislation to protect a particularly vulnerable population from COVID-19.  They say, however, that requiring them to get the vaccine interferes with the free exercise of their "sincerely held

religious beliefs that Scripture is the infallible, inerrant word of the Lord Jesus Christ, and that they are to follow its teaching," compels them to "change those beliefs or act in contradiction to them," and forces them "to choose between the teachings and requirements of their sincerely held religious beliefs in the commands of Scripture and the State's imposed value system." (ECF No. 1 ¶¶ 121, 124.) Focusing on Section 2.61's exemption for employees with medical conditions for whom vaccination would be dangerous, and on the fact that the earlier Emergency Order included a religious exemption, the plaintiffs argue the State did not act neutrally when it enacted Section 2.61, and that Section 2.61 is not generally applicable because it permits comparable secular conduct—a medical exemption—and because it provides for a system of individualized exemptions. (ECF No. 94 at 11-17.)

The State Defendants respond that the Second Circuit has already found Section 2.61 to be facially neutral (ECF No. 98 at 3), and that the absence of a religious exemption does not subject Section 2.61 to strict scrutiny; "[t]he Supreme Court explained long ago that mandatory vaccination laws constitute a valid exercise of the States' police powers and do not offend 'any right given or secured by the Constitution,' because the States' police powers allow imposition of 'restraints to which every person is necessarily subject for the common good.'" (*Id.* at 4.)

The First Amendment, applicable to the states through the Fourteenth Amendment, provides that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940); U.S. CONST. amend. I. As the Supreme Court has explained, "[t]he free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Emp. Div. Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990). The Free Exercise Clause "embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in

the nature of things, the second cannot be.  Conduct remains subject to regulation for the protection of society."  *Cantwell*, 310 U.S. at 303-04.  The Supreme Court has "never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate."  *Smith*, 494 U.S. at 878-79.  Indeed, the "right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'"  *Smith*, 494 U.S. at 879 (1990) (citing *United States v. Lee*, 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring)).  In short, "if prohibiting the exercise of religion . . . is not the object of the [law] but merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended."  *Id.* at 878.

Accordingly, a "neutral law of general applicability" is subject to rational basis review—whether the classification drawn by the statute is rationally related to a legitimate state interest —even if it incidentally burdens a particular religious practice.  *Id.* at 878-79.  On the other hand, when a plaintiff shows that the government has burdened his sincere religious practice "pursuant to a policy that is not 'neutral' or 'generally applicable,'" the court will find a constitutional violation unless the government can satisfy the more demanding "strict scrutiny" standard, by demonstrating that "its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest."  *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421-22 (2022).

The plaintiffs say that Section 2.61 is neither neutral nor generally applicable, because it treats comparable secular activity—which they identify as the limited medical exemption—more favorably than religious activity, and prohibits religious conduct while permitting secular

conduct that undermines the state's asserted interests.  (ECF No. 94 at 11-17.)  For this reason, the plaintiffs assert that Section 2.61 should be subject to strict scrutiny, a standard that the plaintiffs contend it cannot meet.

### a.    Neutrality

A law is not neutral if it "discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons."  *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 532 (1993).  A court first determines whether the challenged law is facially neutral, because "the minimum requirement of neutrality is that a law not discriminate on its face."  *Id.* at 533.  However, even a facially neutral law can violate the neutrality principle if it "targets religious conduct for distinctive treatment."  *Id.* at 534.  To determine whether the object or purpose of a law "is the suppression of religion or religious conduct," a court looks to "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body."  *Id.* at 533, 540 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267-68 (1977)).

The plaintiffs argue that the mandate is not neutral because it includes a medical exemption, and thus "treats religious exemptions less favorably than *some* nonreligious exemptions;" in the plaintiffs' words, this "double standard is not a neutral standard."  (ECF No. 94 at 11-12, 16) (emphasis in original).

Section 2.61 is neutral on its face.  It does not refer to religion at all, and applies to "all persons employed or affiliated with a covered entity" who could "potentially expose other covered personnel, patients or residents to" COVID-19; the only exception is for employees with medical conditions that qualify for a medical exemption.  10 N.Y.C.R.R. § 2.61(a)(2), (d); *see*

*also We The Patriots I*, 17 F.4th at 281 ("Section 2.61 is facially neutral because it does not single out employees who decline vaccination on religious grounds. It applies to all 'personnel,' as carefully defined in the Rule, aside from those who qualify for the narrowly framed medical exemption."). Nor does Section 2.61 carve out a category specifically for religious employees or subject them to harsher treatment. Rather, it provides exemptions for employees whose medical conditions make vaccination "detrimental to [their] health." 10 N.Y.C.R.R. § 2.61(d).

It is true, of course, that the plaintiffs need only plead facts that give rise to a "'slight suspicion' of religious animosity," *New Hope Family Servs., Inc. v. Poole*, 966 F.3d 145, 165 (2d Cir. 2020), but they have not done so. They cite no evidence to suggest that the State's purpose in enacting Section 2.61 was to suppress or discriminate against the exercise of religion, such as comments by officials demonstrating bias against religious beliefs or practices.[22]

Rather, in an effort to demonstrate religious animus, the plaintiffs cite the inclusion in the Emergency Order of both a religious exemption and a medical exemption. The fact that Section 2.61 did not also include a religious exemption, the plaintiffs say, demonstrates that the regulation is not neutral. (ECF No. 94 at 11-12.) But as the Second Circuit pointed out in *We the Patriots I*, the plaintiffs "misconstrue the connection" between the two actions by characterizing Section 2.61 as simply a revision of the Emergency Order. *We The Patriots I*, 17 F.4th at 282. Section 2.61 did not amend the Emergency Order. On the contrary, the two actions

---

[22]The plaintiffs maintain that "whether Plaintiffs are similarly situated to other healthcare workers receiving nonreligious exemptions is a fact question inappropriate for resolution on a motion to dismiss," and that they "have plausibly alleged that they were treated worse than similarly situated individuals, and State Defendants' factual contentions to the contrary are not grounds for dismissal." (ECF No. 94 at 23.) They do not, however, argue that discovery or additional factual development is necessary to establish whether the State was motivated by religious animosity in promulgating Section 2.61. As explained further below, whether the plaintiffs are similarly situated to employees with medical conditions is a question that can be decided on the law, based on the existing record.

were governed by different statutory authority, and involved different governmental entities and different processes. Commissioner Zucker issued the Emergency Order, pursuant to New York Public Health Law § 16, as an emergency measure for a finite period—a maximum of 15 days—with no provision for renewal. *Id*. at 275. The PHHPC, comprised of 25 members, issued Section 2.61 pursuant to New York's emergency rulemaking process, which as the Second Circuit also pointed out, involved "more process, public input, and support." *Id*. at 282. After "an extensive process" that included the development of "specific findings and a regulatory impact statement," the Council issued Section 2.61, which covered more entities than the Emergency Order, was in effect for 90 days, and included a renewal provision. *Id*. In addition, during the period between the issuance of the Emergency Order and the adoption of Section 2.61, the FDA approved a vaccine for people 16 years and older, the Delta variant continued to spread throughout New York, and a new governor assumed office. *Id*. at 283.

The PHHPC's decision not to include a religious exemption in Section 2.61 comports with multiple New York State vaccine regulations that require all employees of hospitals, nursing homes, diagnostic and treatment centers, home health agencies and programs, assisted living residences, and hospices to be vaccinated against measles and rubella, and that do not include religious exemptions.[23] Similarly, N.Y. Pub. Health Law § 2164 requires that children

---

[23] *See* 10 N.Y.C.R.R. § 405.3 (requiring hospital personnel to be vaccinated against rubella, allowing for medical exemptions but not religious exemptions); *id.* § 415.26 (requiring nursing home personnel to be vaccinates against measles and rubella, allowing for medical exemptions but not religious exemptions); *id.* § 751.6 (requiring employees of diagnostic and treatment centers to be vaccinated against measles and rubella, allowing for medical exemptions but not religious exemptions); *id.* § 763.13 (requiring personnel of certified home health agencies, long term home healthcare programs and AIDS home care programs to be vaccinated against measles and rubella, allowing for medical exemptions but not religious exemptions); *id.* § 766.11 (requiring personnel of licensed home care services agencies to be vaccinated against measles and rubella, allowing for medical exemptions but not religious exemptions); 10 NYCRR § 794.3 (requiring hospice personnel to be vaccinated against measles and rubella, allowing for medical exemptions but not religious exemptions); *id.* § 1001.11 (requiring assisted living personnel to be vaccinated against measles and rubella, allowing for medical exemptions but not religious exemptions).

be immunized from certain diseases, including measles, before they can attend any public or private school or childcare facility, and also does not include a religious exemption. *See Phillips*, 775 F.3d at 543 (religious exemptions to vaccine mandates are not constitutionally required); *see also Prince*, 321 U.S. at 166-67 (holding that a parent "cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds. The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death.").

The plaintiffs have not alleged any facts demonstrating the State was motivated by anything other than the concerns that motivated the State to enact these earlier vaccination requirements: protecting the public—in this case healthcare workers, hospital patients and elderly residents of nursing homes—from exposure to a highly contagious and potentially fatal infection.

**b.      General Applicability**

The plaintiffs' claim that the mandate is not generally applicable is premised on the same grounds—the inclusion of the medical exemption and the absence of a religious exemption, which was included in the Emergency Order.

A law may not be "generally applicable" if it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," or "invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *We The Patriots I*, 17 F.4th at 284 (citing *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021)).

*i.    "Comparable" Secular Conduct*

A law is not generally applicable if it "is substantially underinclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to

the legitimate government interests purportedly justifying it." *Cent. Rabbinical Cong. of U.S. & Canada v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 196-97 (2d Cir. 2014) (citing *Lukumi*, 508 U.S. at 535-38). "Whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue . . . . Comparability is concerned with the risks various activities pose." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam) (citation omitted).

The first question is whether the religious and secular interests are comparable; if they are, the Court must determine whether "the less favorable treatment of religious interests results from a constitutionally impermissible value judgment." *Lowe*, 2022 WL 3542187, at *12. The plaintiffs say that the "State Defendants treat nonreligious, medically exempt workers more favorably (by not firing them) than the religious objectors (who have all been fired)." (ECF No. 94 at 14.) In addition, the plaintiffs argue that "allowing a healthcare worker to remain unvaccinated undermines the State's asserted public health goals equally whether that worker happens to remain unvaccinated for religious reasons or medical ones." (ECF No. 94 at 14 (citing *Dr. A*, 142 S. Ct. at 556 (Gorsuch, J., dissenting)).) According to the plaintiffs, an unvaccinated worker can contract and spread COVID-19 whether the worker is unvaccinated for religious or medical reasons, and therefore, all unvaccinated workers pose the same threat to patients and other healthcare workers. The plaintiffs misunderstand the extent of the government interest at issue.

As explained above, determining "the asserted government interest that justifies the regulation at issue" is an essential part of the comparability analysis. *Tandon*, 141 S. Ct. at 1296. The State identified its objectives in adopting Section 2.61 in the Regulatory Impact Statement: to prevent the spread of COVID 19 in healthcare facilities among employees, residents and

patients, and to protect healthcare workers so that they can continue working, which in turn avoids staffing shortages, thus protecting patients and residents "even beyond a COVID-19 infection." *We the Patriots I*, 17 F.4th at 285; (*see also* ECF No. 82 at 14 (identifying the State's interest as protecting "public health and safety by reducing the incidence of COVID-19"); ECF No. 82 at 4-6 ("reducing the number of unvaccinated personnel who can expose vulnerable patients to a potentially deadly disease in a healthcare setting," "reduc[ing] burdens on healthcare workers," and "prevent[ing] harm to front line workers.").)

It is self-evident that requiring an employee to be vaccinated even if the employee has a documented medical condition that makes vaccination unsafe would not promote the State's interest in protecting healthcare workers. In addition, "applying the vaccine to individuals in the face of certain contraindications, depending on their nature, could run counter to the State's 'interest in protecting the integrity and ethics of the medical profession.'" *We the Patriots I*, 17 F.4th at 285 (citing *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007)). Nor would it promote the State's interest in avoiding staffing shortages, which pose additional risks to patients, since the healthcare worker made ill by the vaccination could very well need to be absent from work. On the other hand, requiring someone with a religious objection to be vaccinated does not endanger that person's health, but clearly protects that employee, patients and elderly residents, as well as other employees from infection. *See W.D. v. Rockland County*, 521 F. Supp. 3d 358, 403 (S.D.N.Y. 2021) (concluding that New York's emergency declaration mandating vaccinations against measles, which provided a medical exemption but not a religious exemption, met the requirement of general applicability by "encouraging vaccination of all those for whom it was medically possible, while protecting those who could not be inoculated for medical reasons").

It is also significant that medical exemptions are limited in time and available "only until such immunization is found no longer to be detrimental to such personnel member's health." 10 N.Y.C.R.R. § 2.61(d)(1). A religious exemption, on the other hand, would probably last indefinitely, absent the development of vaccines that do not conflict with sincerely held religious beliefs. *We the Patriots I*, 17 F.4th at 286.

The plaintiff relies on *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359 (3d Cir. 1999), but that case does not compel a different result. The Newark Police Department enforced a "no beard" policy to further its interest in projecting "a monolithic, highly disciplined force," and because "uniformity" benefitted the officers and "offer[ed] the public a sense of security in having readily identifiable and trusted public servants." *Id.* at 366. The policy did not apply to undercover officers, and there was a medical exemption for officers with certain skin conditions. *Id.* at 360. There was, however, no religious exemption for officers whose religion required them to grow beards. *Id.*

The Third Circuit concluded that the exception for undercover officers was not subject to strict scrutiny; exempting undercover officers did "not undermine the Department's interest in uniformity" because undercover officers are not meant to be "readily identifiable" as police officers. *Id.* at 366. The inclusion of a medical exemption while not permitting a religious exemption, however, undermined the Department's stated goals. The court pointed out that uniformed officers were "readily identifiable" whether they had beards or not. *Id.* The court also rejected the Department's "suggestion" that "the presence of officers who wear beards for religious reasons would undermine public confidence in the force" or the force's "morale and esprit de corps," but the same would not be true for officers who wore beards for medical reasons. *Id.* at 366-67. Under these circumstances, the court was "at a loss to understand why

religious exemptions threaten important city interests but medical exemptions do not." *Id.* There is no similar contradiction in this case.[24]

Nor is this case comparable to the occupancy limits cases recently decided by the Supreme Court. In *Roman Catholic Diocese of Brooklyn v. Cuomo*, the Court struck down occupancy limits that applied to religious services, but not to secular businesses, finding that the limits "single[d] out houses of worship for especially harsh treatment." 141 S. Ct. 63, 66 (2020). In *Tandon v. Newsom*, the Court invalidated a prohibition against indoor gatherings of more than three households that had the effect of restricting at-home religious gatherings while allowing groups of more than three households to gather in public settings, like hair salons, retail stores, and restaurants. 141 S. Ct. at 1296-97 (rejecting the Ninth Circuit's finding that secular activities posed less risk of transmission than the religious gatherings). In both cases, the Court found that the restrictions limited religious activity while permitting comparable secular activity, even though the secular activity posed the same risks.

The rule at issue in this case involves no "singling out" of religious employees. Indeed, Section 2.61 applies equally to all employees who can be vaccinated safely, regardless of their religious beliefs or practices, whether they have political objections to the vaccine, or question their efficacy or safety, or any of the many other reasons that people choose not to get vaccinated. *See Lowe*, 2022 WL 3542187, at *13 ("In the context of the COVID-19 vaccine mandate, the medical exemption is rightly viewed as an essential facet of the vaccine's core purpose of protecting the health of patients and healthcare workers, including those who, for bona fide medical reasons, cannot be safely vaccinated. In addition, the vaccine mandate places

---

[24] For the same reason, the plaintiff's reliance on *Litzman v. N.Y. City Police Dep't*, No. 12-CV-4681, 2013 WL 6049066, at *3 (S.D.N.Y. Nov. 15, 2013), which involved a similar police department policy, is unavailing.

an equal burden on all secular beliefs unrelated to protecting public health—for example, philosophical or politically-based objections to state-mandated vaccination requirements—to the same extent that it burdens religious beliefs.").  Accordingly, the plaintiffs have not demonstrated that Section 2.61's medical exemption and the religious exemption they seek are comparable.

### ii. Individualized Exemptions

"General applicability may be absent when a law provides 'a mechanism for individualized exemptions,' because it creates the risk that administrators will use their discretion to exempt individuals from complying with the law for secular reasons, but not religious reasons."  *We the Patriots I*, 17 F.4th at 288 (quoting *Smith*, 494 U.S. at 884).  While a mechanism for individualized exemptions might mean that the law is not "generally applicable," the "'mere existence of an exemption procedure,' absent any showing that secularly motivated conduct could be impermissibly favored over religiously motivated conduct, is not enough to render a law not generally applicable and subject to strict scrutiny."  *Id.* at 288-89 (citing *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 276 (3d Cir. 2007)).

The plaintiffs allege that Section 2.61 "creates a system of individualized exemptions for preferred exemption requests while discriminating against requests for exemption and accommodation based on sincerely held religious beliefs" (ECF No. 1 ¶ 129), which is "sufficiently suggestive of discriminatory intent so as to trigger heightened scrutiny."  (ECF No. 94 at 15 (quoting *City of Newark*, 170 F.3d at 365).)[25]  This argument is not persuasive.

---

[25] As explained above, the plaintiff's reliance on *City of Newark* is misplaced, because the policy at issue there undermined the Department's stated objectives and targeted a religious practice.  Section 2.61 does not.

The medical exemption in Section 2.61 does not permit the State or the private employers to "decide which reasons for not complying with the policy are worthy of solicitude," or give them the discretion to "exempt individuals from complying with the law for secular reasons, but not religious reasons." *We the Patriots I*, 17 F.4th at 288-89. Rather, it requires the application of objective standards to a clearly defined group of employees: those who "present a certification from a physician or certified nurse practitioner attesting that they have a pre-existing health condition that renders the vaccination detrimental to their health, in accordance with generally accepted medical standards, such as those published by ACIP, for the period during which the vaccination remains detrimental to their health." *We the Patriots I*, 17 F.4th at 289.

**c.    Rational Basis Review**

Under the rational basis standard, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 54 (2d Cir. 2007) (citing *City of Cleburne, Tex. v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985)). "This form of review is highly deferential." *Winston v. City of Syracuse*, 887 F.3d 553, 560 (2d Cir. 2018).

Section 2.61 easily meets this standard. It serves the legitimate government purpose of protecting public health and safety by reducing the incidence of COVID-19 in nursing homes and hospitals, thus protecting patients, residents and employees. "Faced with an especially contagious variant of the virus in the midst of a pandemic that has now claimed the lives of over 750,000 in the United States and some 55,000 in New York, the State decided as an emergency measure to require vaccination for all employees at healthcare facilities who might become infected and expose others to the virus, to the extent they can be safely vaccinated. This was a reasonable exercise of the State's power to enact rules to protect the public health." *We the Patriots I*, 17 F.4th at 290; *see also Kane v. De Blasio*, 19 F.4th 152, 166 (2d Cir. 2021) (finding

that rational basis review applied to an order issued by the Commissioner requiring all Department of Education employees be vaccinated against COVID-19, a standard that the order "plainly satisifie[d]" as a "reasonable exercise of the State's power to act to protect the public health"); *Maniscalco v. N.Y.C. Dep't of Educ.*, 563 F. Supp. 3d 33, 39 (E.D.N.Y. Sept. 23, 2021) (finding the requirement that all Department of Education employees be vaccinated against COVID-19 "a rational policy decision surrounding how best to protect children during a global pandemic").[26]

Accordingly, Section 2.61 is rationally related to a legitimate governmental interest. For that reason, the plaintiffs' free exercise claim is dismissed.

## II. Equal Protection Clause

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. It therefore "requires that the government treat all similarly situated people alike." *Harlen Assocs. v. Incorporated Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001)

---

[26] At the August 2, 2022 hearing, counsel argued that discovery could show that unvaccinated healthcare workers were not more likely to transmit COVID-19 than vaccinated workers, and that firing employees who refused to get vaccinated hurt the "availability" of staff more than granting the exemptions would have. (Aug. 2, 2022 Tr. at 27:8-25, 31:23-32:12.) In deciding that Section 2.61 was a necessary measure to reduce the transmission of COVID-19 in healthcare facilities, the State relied on the PHHPC's finding that "unvaccinated individuals are approximately 5 times as likely to be diagnosed with COVID-19 compared to vaccinated individuals . . . [and] unvaccinated [individuals] have over 11 times the risk of being hospitalized with COVID-19." 10 N.Y.C.R.R. § 2.61; (ECF No. 1-9 at 10.) This was reasonable. Nor was the State obligated to adopt the plaintiffs' additional theories and approaches—that "masking and testing protocols remain sufficient to prevent the spread of COVID-19 among healthcare workers, and constitute a reasonable alternative to vaccination as an accommodation of sincerely held religious beliefs" (ECF No. 1 ¶ 75), and that granting religious exemptions and allowing staff to take off from work only when they are sick with COVID-19 better serves the State's interest in maintaining adequate staffing needs. The PHHPC considered and rejected these options as inferior to vaccination, and that was a rational decision. It was reasonable for the State to conclude that the measures the plaintiffs suggest would not have been as effective as vaccines, and that because unvaccinated employees are more likely to contract and spread COVID-19, allowing them to work in proximity to vulnerable patients and other employees was an unacceptable risk.

(citing *City of Cleburne*, 473 U.S. at 439).  A plaintiff claiming an equal protection violation must "show adverse treatment of individuals compared with other similarly situated individuals and that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."  *Miner v. Clinton County*, 541 F.3d 464, 474 (2d Cir. 2008) (internal quotation marks and citation omitted).  "Unless a statute or state action provokes 'strict judicial scrutiny because it interferes with a fundamental right or discriminates against a suspect class, it will ordinarily survive an equal protection attack so long as the challenged classification is rationally related to a legitimate governmental purpose.'"  *Maniscalco*, 563 F. Supp. 3d at 41 (quoting *Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 457-58 (1988)).

The plaintiffs' equal protection claim is related to their First Amendment free exercise claim; they maintain that the State treats them as religious objectors—differently than so-called similarly situated "nonreligious objectors"—those employees whose medical conditions make vaccination unsafe.  As explained above, the plaintiffs and employees with medical conditions are not similarly situated.  Employees with medical conditions cannot be vaccinated because it endangers their health; the plaintiffs have no medical condition, and thus can be vaccinated safely.

In any event, the equal protection claim fails because the free exercise challenge fails.  "Where a law subject to an equal protection challenge 'does not violate [a plaintiff's] right of free exercise of religion,' courts do not 'apply to the challenged classification a standard of scrutiny stricter than the traditional rational-basis test.'"  *W.D. v. Rockland County*, 521 F. Supp. 3d 358, 410 (S.D.N.Y. 2021) (quoting *A.M. ex rel. Messineo v. French*, 431 F. Supp. 432, 447 (D. Vt. 2019)); *see also Johnson v. Robison*, 415 U.S. 361, 375 n.14 (1974) ("[S]ince we hold in

Part III, *infra*, that the Act does not violate appellee's right of free exercise of religion, we have no occasion to apply to the challenged classification a standard of scrutiny stricter than the traditional rational-basis test.").

As explained above, Section 2.61 does not violate the plaintiffs' First Amendment rights, because it serves legitimate purposes of stemming the spread of COVID-19 in hospitals and nursing homes and protecting patients and healthcare workers. Accordingly, the equal protection claim is dismissed.

**III.    Title VII of the Civil Rights Act of 1964**

Title VII makes it unlawful for an employer "to discharge . . . or otherwise to discriminate against any individual" in his or her employment "because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). The statute also requires employers to offer reasonable religious accommodations that do not cause undue hardship. *We the Patriots I*, 17 F.4th at 292 ("To avoid Title VII liability for religious discrimination . . . an employer must offer a *reasonable* accommodation that does not cause the employer an undue hardship. Once any reasonable accommodation is provided, the statutory inquiry ends." (emphasis in original)). The plaintiffs assert that the Private Defendants violated Title VII because they did not give the plaintiffs a religious "accommodation" exempting them from the vaccine mandate. (ECF No. 1 ¶¶ 168-70.) The Private Defendants respond that the plaintiffs have not exhausted their administrative remedies, and that in any event, Title VII does not require employers to "accommodate religious beliefs or practice when doing so would pose an undue hardship on the employer." (ECF No. 83 at 11; *see also* ECF No. 85 at 11-12; ECF No. 87-3 at 16.) The Private Defendants assert that exempting the plaintiffs from the vaccination requirement while permitting them to continue to work in hospital and nursing home facilities would create undue

hardship by putting patients and staff at risk (ECF No. 87-3 at 18), and by forcing the Private

Defendants to violate the law. (*Id.* at 17; ECF No. 85 at 11-12; ECF No. 83 at 11-12.)

A plaintiff must exhaust administrative remedies before filing a Title VII claim in federal

court. *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003) ("As a precondition to filing a Title

VII claim in federal court, a plaintiff must first pursue available administrative remedies and file

a timely complaint with the EEOC."); *Fowlkes v. Ironworkers Loc. 40*, 790 F.3d 378, 384 (2d

Cir. 2015) ("It is well established that Title VII requires a plaintiff to exhaust administrative

remedies before filing suit in federal court."); *Hernandez v. Premium Merch. Funding One, LLC*,

No. 19-CV-1727, 2020 WL 3962108, at *3 (S.D.N.Y. July 13, 2020) ("It is axiomatic that a

plaintiff must exhaust her administrative remedies before filing a Title VII claim."). "To

exhaust, a plaintiff must file a written description of the unlawful employment practice with the

EEOC or relevant state or local agency within 300 days of its occurrence . . . Regardless of

whether the EEOC acts on a charge, the EEOC must issue a right-to-sue notice 180 days after the

filing of that charge." *Hernandez*, 2020 WL 3962108, at *3. "A complainant then has 90 days

to bring suit against the employer." *Id.* If the plaintiff has not exhausted her administrative

remedies, the claim must be dismissed. *See Doe v. Hochul*, No. 21-CV-1078, 2022 WL 446332,

at *6-8 (N.D.N.Y. Feb. 14, 2022) (dismissing healthcare worker's Title VII claim for failure to

exhaust administrative remedies). The purpose of the exhaustion requirement "is to give the

administrative agency the opportunity to investigate, mediate, and take remedial action." *Brown

v. Coach Stores, Inc.*, 163 F.3d 706, 712 (2d Cir. 1998).

The plaintiffs concede that they have not received right-to-sue letters.[27] (ECF No. 94 at

31-33; Aug. 2, 2022 Tr. at 7:10-15 ("[W]e still await right to sue letters from the EEOC for Title

---

[27] The plaintiffs do not specify the date on which they filed complaints with the EEOC, or whether they
filed complaints against all three Private Defendants.

VII claims for all the plaintiffs.").) Nevertheless, the plaintiffs urge the Court to exercise "incidental equity jurisdiction" while they satisfy the exhaustion requirement. (ECF No. 94 at 33.) They rely on *Sheehan v. Purolator Courier Corp.*, 676 F.2d 877 (2d Cir. 1981), in which the Second Circuit ruled that it had "jurisdiction to entertain a motion for temporary injunctive relief against [the employer] while the charge is pending before the EEOC and before the EEOC has issued a right to sue letter." *Id.* at 887. The plaintiffs' request for injunctive relief was denied, so *Sheehan* does not apply. The plaintiffs cite no other compelling reason to ignore the exhaustion requirement. Their Title VII claims could be dismissed on this basis alone.

In any event, the plaintiffs' Title VII claim fails on the merits. The plaintiffs argue that whether the religious exemption is an undue burden is "a question of fact not suitable for determination on a motion to dismiss" (ECF No. 94 at 28), but do not suggest what further factual development is necessary. In fact, like the plaintiffs' other challenges to Section 2.61, resolving this challenge at the motion to dismiss stage is appropriate. The sole "accommodation" the plaintiffs seek—a religious exemption from the vaccine requirement— would impose an undue hardship on the Private Defendants because it would require them to violate state law. *See Lowman v. NVI LLC*, 821 F. App'x 29, 32 (2d Cir. 2020) (upholding the lower court's dismissal of a Title VII claim where an employer could not have granted an employee's accommodation request without violating federal law); *Cassano v. Carb*, 436 F.3d 74, 75 (2d Cir. 2006) ("Plaintiff's reliance on anti-discrimination statutes is misplaced because defendants' policy of requiring SSNs applied equally to all employees and was also a necessary consequence of defendants' obligations under federal law."); *see generally Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 830 (9th Cir. 1999) ("[C]ourts agree that an employer is not

liable under Title VII when accommodating an employee's religious beliefs would require the employer to violate federal or state law.").

In addition, the Private Defendants persuasively argue that in addition to requiring the defendants to violate the law, exempting the plaintiffs from the vaccine requirement would expose vulnerable patients and nursing home residents, as well as other healthcare workers, to the COVID-19 virus, which is obviously a significant hardship.[28]  Accordingly, the plaintiffs' Title VII claim is dismissed.

## IV.    Supremacy Clause

The plaintiffs allege that Section 2.61 violates the Supremacy Clause.  In particular, the plaintiffs maintain that "[the defendants] have purported to remove the availability of religious exemptions and accommodations within the State of New York, have ignored Title VII's commands that employers provide reasonable accommodations to individuals with sincerely held religious beliefs, and have claimed that the Governor's COVID-19 Vaccine Mandate prohibits employers in New York from even considering a religious exemption or accommodation request."  (ECF No. 1 ¶ 145.)  They also say that the "State Defendants have abolished the entire accommodation process under Title VII for religious objectors to their employee vaccine mandate," despite being required to "provide at least a process for an employee to seek an

---

[28] Aside from the obvious hardship associated with an increase in infections and its deleterious effect on staff and patients, the Private Defendants could also face legal liability if a patient or resident treated by an unvaccinated employee were to contract COVID-19.  The number of lawsuits filed in this District based on COVID-19 deaths in nursing homes demonstrates that this is more than just a theoretical possibility.  *See, e.g., Gavin v. Jackson Heights Care Ctr., LLC*, No. 22-CV-5006 (E.D.N.Y. Aug. 24, 2022); *Gonzalez v. Parker Jewish Inst. for Health Care & Rehab. et al.*, No. 22-CV-5199 (E.D.N.Y. Aug. 81, 2022); *Esposito v. Parker Jewish Inst. for Healthcare & Rehab.*, No. 22-CV-5012 (E.D.N.Y. Aug. 24, 2022); *Thompson v. Ditmas Park Rehab. & Care Center, LLC et al.*, No. 22-CV-4555 (E.D.N.Y. Aug. 3, 2022); *Weppler v. Highfield Gardens Care Ctr. of Great Neck*, No. 22-CV-2905 (E.D.N.Y. May 18, 2022).

accommodation of the employee's sincerely held religious beliefs." (ECF No. 94 at 22, 27.) All the defendants respond by arguing that the Supremacy Clause does not create a cause of action. (ECF Nos. 83-1 at 7; 82 at 17; 85 at 17; 87-3 at 8-9.) Additionally, they argue that there is no conflict between Section 2.61 and Title VII, and therefore, the plaintiffs' preemption claim should be dismissed. (ECF Nos. 83-1 at 8-9; 82 at 18-21; 85 at 17-18; 87-3 at 9-13.)

The Supremacy Clause "is not the 'source of any federal rights,' and certainly does not create a cause of action." *Armstrong v. Exceptional Child Ctr.*, *Inc.*, 575 U.S. 320, 324-25 (2015) (citation omitted); *see also Davis v. Shah*, 821 F.3d 231, 245 (2d Cir. 2016) (rejecting a claim that rested "entirely on an implied right of action arising out of the Supremacy Clause"). Accordingly, to the extent the plaintiffs make a claim solely under the Supremacy Clause, the claim is dismissed.

To the extent the plaintiffs mean to make a Supremacy Clause preemption claim,[29] that claim must also be dismissed. There are three categories of preemption: "(1) express preemption, where Congress has expressly preempted local law; (2) field preemption, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives." *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010). The plaintiffs' claim that the defendants have "ignored Title VII" and "abolished the entire accommodation process under Title VII for

---

[29] In *We the Patriots I*, the Second Circuit evaluated a similar claim as a preemption challenge. 17 F.4th at 290-93.

religious objectors to their employee vaccine mandate" falls into the third category—conflict preemption.  (ECF No. 1 ¶ 145; ECF No. 94 at 27.)

To succeed on this theory, the plaintiffs must show that Section 2.61 "conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives."  *Town of Clarkstown*, 612 F.3d at 104.  In other words, the plaintiffs must show that is impossible for employers to comply with Title VII and Section 2.61, or that Section Title VII is an "obstacle to the achievement of federal objectives" as expressed in Title VII.  *Id.*

As relevant here, Title VII makes it unlawful for employers "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion."  42 U.S.C. § 2000e(2)(a)(1).  "Religion" includes "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate . . . an employee's . . . religious observance without undue hardship on his business."  *Id.* § 2000e(j); *see also We the Patriots I*, 17 F.4th at 291.

The plaintiffs claim that absence of a religious exemption in Section 2.61 is the equivalent of denying them a religious accommodation under Title VII.  In making this claim, as discussed above, the plaintiffs conflate exemption with accommodation, and use the terms interchangeably throughout their submissions.  But the plaintiffs do not allege that they have sought anything other than a complete exemption—which they characterize as an accommodation—while continuing to work directly with patients, elderly people and co-

workers.  They have not, for example, asked for reassignment to a position in which they would be not interact directly with patients, elderly nursing home residents or other healthcare workers.

The defendants are not required to give the plaintiffs the accommodation they demand—exempting them from the vaccination requirement while still permitting them to work directly with vulnerable patients and senior citizens.  Indeed, to avoid Title VII liability, an employer is not required to "offer the accommodation the employee prefers."  *We the Patriots I*, 17 F.4th at 292 (citing *Cosme v. Henderson*, 287 F.3d 152, 158 (2d Cir. 2002)).  Title VII requires an employer to offer a reasonable accommodation that does not cause the employer "undue hardship."[30]

As the Second Circuit observed, Section 2.61 "does not require employers to violate Title VII because although it bars an employer from granting a religious *exemption* from the vaccination requirement, it does not prevent employees from seeking a religious *accommodation* allowing them to continue working consistent with the Rule, while avoiding the vaccination requirement."  *We the Patriots I*, 17 F.4th at 292 (emphasis in original).  Because the vaccination requirement "does not foreclose all opportunity for Plaintiffs to secure a reasonable accommodation under Title VII," *id.*, it is not impossible for employers to comply with both Section 2.61 and Title VII.  The plaintiffs' preemption claim is dismissed.

**V.      Conspiracy to Violate Civil Rights in Violation of 42 U.S.C. § 1985**

The plaintiffs allege that the defendants conspired to deprive them of their civil rights when—in the plaintiffs' words, they "reached an agreement . . . to deprive all healthcare workers in New York [without] any exemption or accommodation for the exercise of their sincerely held

---

[30] Accommodations could include "assignments—such as telemedicine—where [employees unvaccinated for religious reasons] would not pose a risk of infection to other personnel, patients, or residents," which would "remove[] the individual from the scope of the Rule."  *We the Patriots I,* 17 F.4th at 292.

religious beliefs" (ECF No. 1 ¶ 181), by agreeing to enforce Section 2.61 and by denying the plaintiffs' requests for religious exemptions.  (ECF No. 94 at 35-36.)

To state a § 1985(3) conspiracy claim, a plaintiff must allege "(1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States."  *Porter v. City of New York*, No. 03-CV-6463, 2004 WL 7332338, at *5 (E.D.N.Y. Mar. 15, 2004) (quoting *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999)). "In order to maintain an action under Section 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end."  *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (internal quotation marks and citations omitted).  "A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights must be dismissed." *Porter*, 2004 WL 7332338, at *5 (internal quotation marks omitted).

Additionally, "a § 1985(3) 'conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.'"  *Cine SK8, Inc. v. Town of Henrietta*, 791 (2d Cir.2007) (citing *Thomas*, 165 F.3d at 146).  Further, "Section 1985(3) provides no substantive rights itself; rather, it merely provides a remedy for violation of the rights it designates.  As a result, to maintain a claim pursuant to § 1985(3), there must be some predicate constitutional right which the alleged conspiracy violates."  *Friends of Falun Gong v. Pac. Cultural Enter., Inc.*, 288 F. Supp. 2d 273, 279 (E.D.N.Y. 2003) (internal quotation marks and citations omitted).  The plaintiffs' conspiracy claim fails.

The simple answer to the plaintiffs' claim is that, as discussed above, they have not alleged a violation of the law. Accordingly, there can be no conspiracy. *Nasca v. County of Suffolk*, No. 05-CV-1717, 2008 WL 53247, at *8 n.8 (E.D.N.Y. Jan. 2, 2008) ("Plaintiff's conspiracy claim under 42 U.S.C. § 1985 must also fail because there is no underlying Section 1983 violation."); *Cater v. New York*, No. 17-CV-9032, 2019 WL 763538, at *6 (S.D.N.Y. Feb. 4, 2019) ("[B]road and conclusory allegations of conspiracy . . . comprise precisely the sort of § 1985 claim courts have dismissed as implausible."). The § 1985 claim is dismissed.

## CONCLUSION

For the reasons stated above, the defendants' motions to dismiss are granted.[31] The complaint is dismissed for failure to state a claim upon which relief may be granted.

**SO ORDERED.**

s/Ann M. Donnelly

ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
September 30, 2022

---

[31] Because I dismiss all of the plaintiffs' claims for failure to state a claim upon which relief may be granted, I decline to address Trinity's argument that the claims against it should be dismissed for improper venue. (ECF No. 83-1 at 16-22.)